**USA VIDEO TECHNOLOGY CORPORATION,**
Plaintiff,

v.

**MOVIELINK LLC, Defendant.**

No. CIV.A.03–368–KAJ.

United States District Court,
D. Delaware.

Jan. 28, 2005.

Richard D. Kirk, Esq., The Bayard Firm, Wilmington, DE, for plaintiff, Of Counsel: J. William Koegel, Jr., Esq., Stuart Huang, Esq., Scott D. Watkins, Esq., David A. Clark, Esq., and Anthony A. Onorato, Esq., Steptoe & Johnson LLP, Washington, DC.

Steven J. Balick, Esq. and John G. Day, Esq., Ashby & Geddes, Wilmington, DE, for defendant, Of Counsel: Jeffrey M. Olson, Esq. and Samuel N. Tiu, Esq., Sidley Austin Brown & Wood, LLP, Los Angeles, CA.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. INTRODUCTION

This is a patent infringement case. Presently before me are the parties' requests for construction of the disputed claim language of U.S. Patent No. 5,130,-792 (issued July 14, 1992) (the " '792 patent"), pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), and several motions filed by plaintiff, USA Video Technology Corporation ("USVO"), and defendant, Movielink LLC ("Movielink"). The motions filed by USVO include a Motion for Summary Judgment as to the Gunter Article and the '792 Patent's Enablement of the Internet (Docket Item ["D.I."] 127) and a Motion to Exclude or

Limit Admissibility of the Expert Reports and Testimony of Richard T. Mihran and Joseph A. Konstan (D.I.129). The motions filed by Movielink include a Motion for Summary Judgment of Non–Infringement Relating to USVO's Infringement Allegations for Which No Support in the Record Exists (D.I.132), a Motion for Summary Judgment of Non–Infringement, and its Alterative Motion for Summary Judgment of Invalidity (D.I.134), and a Motion for Summary Judgment of Invalidity under 25 U.S.C. § 112 and to Strike Portions of Expert Report (D.I.136). Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.

For the reasons that follow, including my decision on claim construction, USVO's Motion for Summary Judgment as to the Gunter Article and the '792 Patent's Enablement of the Internet (D.I.127) will be denied as moot,[1] and USVO's Motion to Exclude or Limit Admissibility of the Expert Reports and Testimony of Richard T. Mihran and Joseph A. Konstan (D.I.129) will be denied as moot.[2] Movielink's Motion for Summary Judgment of Non–Infringement Relating to USVO's Infringement Allegations for Which No Support in the Record Exists (D.I.132) will be granted in so far as it pertains to indirect infringement. Movielink's Motion for Summary Judgment of Non–Infringement, and its

Alterative Motion for Summary Judgment of Invalidity (D.I.134) will be granted as to non-infringement, and Movielink's Motion for Summary Judgment of Invalidity under 25 U.S.C. § 112 and to Strike Portions of Expert Report (D.I.136) will be denied as moot.[3]

## II. BACKGROUND[4]

### A. Procedural Background

USVO filed a complaint for patent infringement against Movielink on April 10, 2003. (D.I.1.) Movielink filed a counterclaim against USVO on May 30, 2003 (D.I.6), which it later withdrew (D.I.15). USVO and Movielink are scheduled to try this case to a jury beginning on April 4, 2005. (D.I.20.)

### B. The Disclosed Technology

The '792 patent discloses a variant of what is commonly known as "video-on-demand" technology. More specifically, it discloses a system and method for transferring a video program for display at a remote location. (*See* '792 patent, col. 1, ll. 7–9; D.I. 126 at 9.)

#### 1. The State of the Art[5]

In the United States during the 1980s, the majority of telecommunications were

---

1. This motion will be denied as moot because it pertains to the validity of the '792 patent. Because I find that Movielink's Multi–CDN system does not infringe claim 1 of the '792 patent, I need not, and do not, reach the issue of patent validity.

2. This motion will be denied as moot because *it pertains to expert opinions on the issue of* the validity of the '792 patent. As noted (*supra* n. 1), I need not, and do not, reach the issue of patent validity.

3. This motion will be denied as moot because it pertains to the validity of the '792 patent and an expert opinion that was not relied upon to reach my decision. Again, as noted (*supra*, n. 1), I need not reach the issue of

patent validity, nor do I need to determine whether the internet is a "switched telephone network" as opined by the portion of the expert opinion referred to in this motion.

4. The following rendition of background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party, the plaintiff.

5. The uncontested state of the art, as described by plaintiff USVO, and reiterated herein, is taken from the reports of USVO's expert, Dr. William H. Beckman. (*See* D.I. 126 at 6–9 (citing the Opening Expert Report of Dr. Beckman and the Rebuttal Expert Report of Dr. Beckman)).

voice communications carried over the Public Switched Telephone Network (the "PSTN"). (D.I. 126 at 6.) The PSTN of that time consisted of "the network, business, and operations systems that were operated and maintained by AT & T for voice and data communications." (*Id.* at 6–7.) It could be accessed by consumers from their residences via copper wires that were capable of carrying voice and data calls in analog form. (*Id.*) All calls originating from consumer residences were directed to a telephone office, known as a "Central Office," that served a large number of customers. (*Id.*) There were two types of calls, "local" or "long distance." (*Id.*) A local call would remain in analog form and be switched in the Central Office to its intended destination. (*Id.*) A long distance call would be converted from its analog form into digital form, interleaved (or "multiplexed") with other "digitally converted calls," and sent via cable from one telephone switching office to another. (*Id.*)

The PSTN, as described above, was designed and used to transport calls "whose total transmission rate did not exceed 64 kb/s" (kilobits per second). (*Id.*) While optimal for voice calls, this transmission rate was too slow for certain data transmissions. (*Id.*) The typical movie in digital format is a large file which would take days to download at 64 kilobits per second. (*Id.*)

In the 1980s, telephone companies became interested "in enhancing their networks to be able to support telephone communications and very high speed . . . video applications. . . ." (*Id.* at 7–8.) One technology that offered such enhancing ability was called Asynchronous Transfer Mode ("ATM"), "a type of packet-switched network" that operated at very high speeds by utilizing so-called "packets" of data that were small and of fixed size. (*Id.* at 8.) In 1990–1992, the planned ATM network was designed "to be accessed from consumer residences via fiber optic cable that carried voice, data, and video communications in digital form as ATM packets." (*Id.*) In the planned ATM network, the typical movie would be downloadable in minutes rather than days. (*Id.* at 9.)

### 2. The '792 Patent

The '792 patent is directed to a system and method for transmitting video programs to remote locations over "selected commercial telephone networks." ('792 patent, col. 2, II. 3–7.) This "video-on-demand" process allows a customer to obtain a video program whenever a customer requests it. (D.I. 126 at 9.) The preferred embodiment includes the following components. A central data facility is "connected to a commercial telephone network." ('792 patent, col. 2, II. 44–47.) A telephone and receiving unit are also connected to the telephone network, at a "remote location." (*Id.* at II. 54–55.) The receiving unit is connected to a video display device, such as a television, for "displaying video programs which have been transferred from the central data facility to the receiving unit." (*Id.* at II. 55–60.)

The preferred embodiment describes two different ways of ordering movies. ('792 patent, col. 2, I. 60–col. 3, I. 5.) The first is to use "the normal telephone" to call the central data facility and order a movie by entering "a proper set of codes" using the buttons on a push-button phone. ('792 patent, col. 2, II. 60–6, col. 3, II. 25–27.) The user then ends the phone call and switches the receiving unit to standby. (*Id.,* col. 2, II. 63–65.) The central data facility then calls the receiving unit and sends (or downloads) the requested program to the receiving unit. (*Id.* at II. 65–68.) The user may then view the program at any time thereafter. (*Id.* at II. 65–68.) The second way to order movies is have a

keyboard or input device attached to the receiver with which the user can identify the program and send the request to the central data facility. ('792 patent, col. 3, II. 1–3.) In this second embodiment, the patent "does not specify ... how the connection is made from the receiver ... to the central data facility." (D.I. 126 at 10.)

Figure 2 of the patent shows a "block diagram of a central data facility," in which "a central processor ... is connected to one or more mass storage devices," which "are preferably high density devices such as optical disks." ('792 patent, col. 3, II. 6–10.) The video programs handled by the central data facility are digitized and compressed for retention in the mass storage devices. (*Id.* at II. 13–16.)

In the preferred embodiment where the user places a request by telephone, the tones generated by pushing the buttons on the phone are transferred to the request interface and are then converted to characters and transmitted to the central processor, which "identifies the caller and determines whether the requested selection is available." (*Id.* at II. 22–31.) In this situation, "[d]esired information, such as the availability of a selection, any delay which may be incurred prior to down loading [sic] the selected program, or an indication of the charges incurred in the transaction, can be returned to the viewer through a request interface by means of ... tones or recorded or synthesized spoken messages." (*Id.* at II. 31–37.)

To respond to the request, the "central processor ... selects an available output channel to [the] distribution interface ... and requests a telephone switching network connection." (*Id.* at II. 38–41.) Based on the information contained in the user-entered codes, "the central processor ... is able to call an authorized number at a known location corresponding to such user." (*Id.* at II. 41–44.) Once a connection is established between the central pro-

cessor and the user's receiver, "the requested program ... [is] transferred from [the] mass storage ... [devices] through the distribution interface to the remote location." (*Id.* at II. 44–47.)

Figure 5 of the patent "shows a preferred embodiment of the receiving unit." ('792 patent, col. 4, II. 64–65.) The incoming data is stored on a mass storage device in the receiver "until the entire requested program has been down loaded [sic] from the central data facility." (*Id.*, col. 5, II. 29–31.) Once play is selected, the stored data is decompressed and converted into a viewable image. (*See id.* at II. 44–61.)

## III. APPLICABLE LAW / STANDARD OF REVIEW

### A. Claim Construction

Patent claims are construed as a matter of law. *Markman,* 52 F.3d at 979. A court's objective is to determine the plain meaning, if any, that those of ordinary skill in the art would apply to the language used in the patent claims. *Waner v. Ford Motor Co.,* 331 F.3d 851, 854 (Fed.Cir.2003) (citing *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir.2001)). In this regard, pertinent art dictionaries, treatises, and encyclopedias may assist a court. *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202–03 (Fed.Cir.2002). The intrinsic record, however, is the best source of the meaning of claim language. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). Therefore, patent claims are properly construed only after an examination of the claims, the specification, and, if in evidence, the prosecution history of the patent. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1324 (Fed.Cir.2003) (citing *Vitronics,* 90 F.3d at 1582).

The intrinsic record is also of prime importance when claim language has no

ordinary meaning in the pertinent art, *see Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1269–70 (2001) (determining that claim language could only be construed with reference to the written description) (citation omitted), and where claim language has multiple potentially applicable meanings, *Texas Digital, Inc.*, 308 F.3d at 1203.

■ If patent claim language has an ordinary and accustomed meaning in the art, there is a heavy presumption that the inventor intended that meaning to apply. *Bell Atl. Network Servs., Inc.*, 262 F.3d at 1268 (citing *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed.Cir.1999)). Thus, unless the inventor has manifested an express intent to depart from that meaning, the ordinary meaning applies. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed.Cir.2002) (internal citation omitted).

■ To overcome that presumption, an accused infringer may demonstrate that "a different meaning is clearly set forth in the specification or ... the accustomed meaning would deprive the claim of clarity." *N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1287 (Fed.Cir.2000). However, the presumption may not be rebutted "simply by pointing to the preferred embodiment...." *Teleflex, Inc.*, 299 F.3d at 1327. It may be rebutted, though, where "the patentee ... deviate[d] from the ordinary and accustomed meaning ... by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.*

■ If claim language remains unclear after review of the intrinsic record, a court "may look to extrinsic evidence to help resolve the lack of clarity." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed.Cir.2001). The

use of extrinsic evidence in the claim construction process, however, is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Id.* (internal citation omitted). A court may not use extrinsic evidence to contradict the import of the intrinsic record, and if the intrinsic record is unambiguous, extrinsic evidence is entitled to no weight. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed.Cir.1997).

## B. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In determining whether there is a triable issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there

is no genuine issue for trial." *Matsushita Elec. Inds. Co., Ltd.,* 475 U.S. at 587, 106 S.Ct. 1348 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. CLAIM CONSTRUCTION / DISCUSSION

### A. Claim Construction

USVO alleges that Movielink infringes the '792 patent by direct literal infringement, by inducing infringement, by contributing to infringement, and by infringement under the doctrine of equivalents. (D.I. 1 at ¶ 20.) Specifically, USVO alleges that Movielink's Multi–CDN system infringes claim 1 of the '792 patent, and the parties' claim construction briefs and arguments regarding infringement are directed solely to interpreting claim 1. (D.I. 126 at 12; D.I. 131 at 1.)

Claim 1 of the '792 patent is as follows: 1. A system for transmitting video programs to remote locations over a switched telephone network, comprising:

a central data facility having means for storing digital compressed versions of video programs;

a request interface connected to said central data facility and to the telephone network, wherein said request interface receives requests for video programs made over the telephone network and communicates them to said central data facility;

a distribution interface connected to said central data facility and to the telephone network, wherein said distribution interface initiates connections over the telephone network with remote locations in response to requests received by said request interface, and transmits thereto compressed versions of video programs

previously requested through said request interface, such compressed versions being transmitted in less time than is required to view the programs in real time;

a receiver at each remote location for connecting to the telephone network and receiving compressed video programs transmitted from said distribution interface, for storing the received programs, and for subsequently playing the video programs at a real time rate on a video display.

('792 patent, col. 7, ll. 41–66 (emphasis added).)

While the parties have identified several terms in claim 1 as requiring construction, I have limited my discussion to interpreting one claim term which, as discussed in detail below, *see infra* Part IV.B.1–3, is dispositive of the outcome of this case. That term is "initiates," as noted in emphasis in the above quotation.

### 1. The Parties' Proposed Constructions

The parties have identified this claim term as "initiates connections" and therefore their proposed constructions encompass not only the term "initiates," but also the term "connections." (D.I. 148 at 12.) USVO proposes that I construe "initiates connections" to mean "creates an association between two or more endpoints (a distribution interface and the remote locations) for the transfer of data." (D.I. 126 at 32; D.I. 148 at 12.) Movielink proposes that I construe "initiates connections" to mean "places calls over a switched telephone network by dialing preauthorized numbers." (D.I. 131 at 22; D.I. 148 at 12.) The arguments made by both parties in the claim construction briefing are focused on the term "connections," and not on the term "initiates." USVO, however, recognizes that the term "initiates" is synony-

mous with "starts," when it states: "Even though both parties to the connection participate in forming the connection, one party *starts* or *initiates* the process." (D.I. 126 at 34 (emphasis added).)

## 2. The Court's Construction

■ The claim term "initiates" in the phrase "wherein said distribution interface *initiates* connections over the telephone network with remote locations in response to requests received by said request interface" ('792 patent, col. 7, ll. 52–56 (emphasis added)), has a plain and ordinary meaning. I will not read limitations into the claim from the specification when the term is easily construed according to its ordinary meaning as understood by a person of ordinary skill in the art. *See Texas Digital Sys., Inc.*, 308 F.3d at 1205. According to Webster's Third New International Dictionary, "initiate" means "to begin or set going." Webster's Third New International Dictionary 1164 (3d ed.1986). The disclosures in the patent specification and prosecution history do not suggest that any other meaning of "initiates" was intended by inventors Tindell and Crawford. *See Teleflex, Inc.*, 299 F.3d at 1325 (internal citation omitted).

Claim 1, as represented above, was not originally included in the patent application. (D.I. 139, Tiu Dec., Ex. F at 18, Tiu Dec., '792 patent application.) It was added by amendment (*id.*, Ex. H at 2, Amendment) after original claim 1 was withdrawn following its rejection for, among other things, being anticipated by Cohen, a prior art patent. (*Id.*, Ex. G at 1–6, Office Action mailed Dec. 17, 1990.) In arguments made to the Patent and Trademark Office distinguishing Cohen, the applicants stated: "The Cohen reference describes a system in which *a local unit . . . initiates* a download of a video program such as a movie. . . . The telephonic connection and request is made by the local unit itself. . . ." (*Id.*, Ex. H at 7, Amendment

(emphasis added).) The applicants argued that the invention claimed in the '792 patent, however, was distinguishable because of the function of the distribution interface: "A *distribution interface . . . initiates* a call to a remote unit, and transmits a compressed video program to it. . . . The *distribution interface initiates* all calls to remote units before transmitting the video programs to them." (*Id.*, Ex. H at 8, Amendment (emphasis added).)

In addition, the applicants argued that their claimed system was different than the prior art because in their system, the central unit is "in control," rather than the local unit. The "control" aspect of the claimed system is directly related to the claim term "initiates" as seen in the following argument:

The difference in the claimed system as described above and the references leads to a system which is construed on entirely different philosophical lines than in the prior art. In the prior art, *the local unit is in charge of the transaction,* ordering and receiving a program at its convenience. In the claimed system, the user merely requests a program; *the central facility ten* [sic] *initiates a new connection* at its convenience and sends a program to the remote unit identified in the request. Since *the central unit is in control rather than the remote unit,* it is easier to design the central unit to make it run very efficiently.

(*Id.*, Ex. H at 9, Amendment (emphasis added).)

Based on the applicants' arguments, it is clear that the inventors did not manifest "an express intent to depart from [the plain and ordinary] meaning." *Teleflex, Inc.*, 299 F.3d at 1325 (internal citation omitted). Therefore, consistent with its plain and ordinary meaning, I construe "initiates" to mean "begins."

## B. Summary Judgment on the Issue of Infringement

A patent infringement analysis involves two steps: claim construction and then the application of the construed claim to the accused process or product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The first step, claim construction, has been held to be purely a matter of law. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir. 1998) (en banc). The second step, application of the claim to the accused product, is a fact-specific inquiry. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed.Cir.2001) (Patent infringement, "whether literal or under the doctrine of equivalents, is a question of fact."). Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.2001).

### 1. Direct Literal Infringement

Movielink has moved for summary judgment that it's Multi–CDN system does not literally infringe claim 1 of the '792 patent.[6] (D.I. 135 at 1.) Determining whether an accused product infringes is a two-step process. *Markman*, 52 F.3d at 976. I have just completed the first step, construing a disputed claim term, and now proceed to step two, a "comparison of the claim to the accused device, [which] requires a determination that every claim limitation or its equivalent be found in the accused device [or process in order to prove infringement]." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed.Cir.2002) (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)).

In order for Movielink to succeed on summary judgment of non-infringement based on allegations of direct literal infringement, it must prove that it does not practice at least one of the claim limitations of the asserted claim. Movielink argues that its Multi–CDN system does not infringe claim 1 of the '792 patent for three reasons:

> First, the Movielink system does not operate over any 'telephone network,' but rather can only operate using the Internet. Second, in the Movielink system it is the 'download' button on the consumer's home computer that initiates' the download of the requested movie—not any 'distribution interface' residing in Movielink's facilities. Third, it is not possible in Movielink's system to 'request' a movie telephonically from one location and then have Movielink transmit the movie to some 'remote location;' the movie is always transmitted to the very same local computer that generated the 'download' request, as part of a single request-and-receive transaction.

(D.I. 135 at 3–4.) Movielink's second argument is dispositive, namely that "it is the *user* in the Movielink system who 'initiates' ... the connection between the user and the central system and the associated

---

**6.** Although Movielink has also moved for summary judgment that its Big–Foot network, a now-retired system replaced by the Multi–CDN system, does not infringe any of the claims of the '792 patent, I do not reach that issue because USVO has stated that it "will not pursue injunctive relief against a retired network that has no prospects for revival, and [that it] has determined not to pursue damages against a network that generated little revenue." (D.I. 142 at 8.) Furthermore, Movielink has not asserted a counterclaim seeking a declaratory judgment of non-infringement. Therefore, the issue of whether Movielink's Big–Foot network infringes the '792 patent is not properly before me.

transmission of video data." (D.I. 158 at 7 (emphasis in original).) Accordingly, I need not determine whether the Movielink Multi–CDN system reads on any of the other limitations of claim 1.

Because the Movielink Multi–CDN system operates over the internet, a brief discussion of the background of the technology at issue is appropriate.[7] Movielink operates using Hypertext Transfer Protocol ("HTTP"), a protocol for communication over the World Wide Web. (D.I. 139, Ex. P at 4, Dr. Joseph Konstan's Rebuttal Expert Report, dated Oct. 6, 2004.) An HTTP connection involves only two HTTP messages: a request and a reply. (*Id.*) More specifically, "HTTP defines a set of requests (also known as HTTP methods) that are used by a client to communicate with a server. It also defines a set of replies for those messages. . . . Defined responses include the successful response, which returns a document such as a file or web page, and a variety of non-successful responses, including error messages and informational messages such as a REDIRECT which informs the client of a new address where the desired data can be found." (*Id.* at 4–5.) "HTTP defines an extensive collection of information to be passed as part of a request or reply," most critical of which is the Uniform Resource Identifier ("URI"), "which is HTTP's way of identifying a specific desired document." (*Id.* at 5.) The "key idea" behind HTTP's design is that "a web server only needs to handle a request and respond to it, then it can forget that the request ever existed. If a subsequent request is made, it is made via a new connection." (*Id.*)

HTTP is a "relatively high-level protocol," built "on top of the reliable communications protocol of the Internet," which includes the Transmission Control Protocol ("TCP") and Internet Protocol ("IP"). (*Id.*) IP "provides addressing of computers on the Internet, . . . addressing of specific ports on each computer . . . and mechanisms for addressing a message from a source . . . to a destination. . . ." (*Id.*) The following, describes TCP and its relation to HTTP.

> TCP . . . is a protocol layered on top of IP to provide reliable bidirectional communications. TCP connections . . . are established through a three-part handshake, after which messages may be transmitted in both directions. The first message in that handshake is sent from the source to the destination, and serves to initiate the TCP connection. The destination replies, and the source confirms the reply. After that, the data may flow in either or both directions until the TCP connection is terminated. . . . When an HTTP client sends a request to an HTTP server, it first does so by initiating a TCP connection. Once the TCP connection is established, it sends the request to the server. The server then replies, and the TCP connection is terminated after the reply is received.

(*Id.*)

Movielink's Multi–CDN system includes three main components: (1) a facility, located in Secaucus, New Jersey; (2) regional data centers located at various locations In the United States; and (3) Movielink Manager ("MM"), which is software located on Movielink customers' personal computers.[8] (D.I. 139, Ex. L at 23, Dr. Beckman's Expert Report, Sept. 25, 2004.) More specifically, the Secaucus facility

---

**7.** Although this background is taken mainly from Dr. Konstan's Rebuttal Expert Report (D.I. 139 at Ex. P), USVO has not alleged any inaccuracies in his description of the underlying technology.

**8.** The following description of the Movielink Multi–CDN system is drawn from both Dr.

Beckman's Expert Report (D.I. 139 at Ex. L) and Dr. Konstan's Rebuttal Expert Report (D.I. 139 at Ex. P). There were no significant differences between the descriptions of the Movielink Multi–CDN system as provided in these reports.

houses several components of the Movielink System, including web servers that offer web pages for the Movielink website, three Content Delivery Sources ("CDS"s) that are responsible for downloading movies to users' personal computers, multiple hard disks on which movies are stored, a Content Delivery Router ("CDR"), and an application server. (*Id.* at 24.) The CDR is an application that "receives requests from Movielink Manager for movies to download, looks up the appropriate CDS, and responds to MM with a redirect response indicating that [MM] should send the request to the appropriate server." (D.I. 139, Ex. P at 7, Dr. Konstan's Rebuttal Expert Report, Oct. 6, 2004.) The CDSs "store movies and provide the actual service of transmitting them to the client when an appropriate request is received (one that matches an authorized transaction)." (*Id.*) [9]

The regional data centers are "facilities associated with regional networks." (D.I. 139, Ex. L at 25, Dr. Beckman's Expert Report, Sept. 25, 2004.) "Movies are stored on hard disks in the regional data centers.... Each Movielink regional data center contains [at least one] CDS that can distribute (download) the stored movies that have been rented by a user. These servers utilize the regional networks for distributing these rented movies." (*Id.*) The movies are stored at the regional data centers or at the Secaucus facility. (*Id.*)

MM is software that resides on Movielink customers' personal computers and can be downloaded from the Movielink website. MM is required for renting, downloading, and playing movies from

Movielink. (*Id.*) In addition to MM, each customer must have a web browser, "a piece of software such as Microsoft's Internet Explorer that presents the user with an interface for 'browsing the web.'" (D.I. 139, Ex. P at 6, Dr. Konstan's Rebuttal Expert Report.)

The Movielink Storefront (the "Website" or "Storefront") is "an application running through a Dynamo application server (e.g., www.movielink.com)." (D.I. 139, Ex. P at 7, Dr. Konstan's Rebuttal Expert Report, Oct. 6, 2004.) The Storefront's functions include "managing user accounts, handling payments, displaying the Movielink catalog, and supporting the range of user navigation through the catalog and up to the point where the Movielink Manager program takes over." (*Id.*)

To determine whether the Movielink Multi–CDN system infringes claim 1 of the '792 patent, it is necessary to describe the sequence of operations for the Movielink Multi–CDN system. The following description of the sequence of operations was taken directly from Dr. Konstan's Rebuttal Expert Report because he provided more detail about the connections which are made and broken during the normal operations of the Movielink Multi–CDN system. USVO acknowledges the accuracy of Dr. Konstan's rendition of the sequence of steps in the allegedly infringing Movielink system. (D.I. 143 at 6, note 5) ("the sequence of steps is adequately set forth in the rebuttal report of ... Dr. Konstan...."). The undisputed sequence of operations for the Movielink Multi–CDN system, after the user has downloaded the MM software, is as follows: [10]

9. Movielink also has "other services executing to support these operations" which are not relevant to the infringement discussion. (D.I. 139, Ex. P at 7, Dr. Konstan's Rebuttal Expert Report, Oct. 6, 2004.)

10. "The numbers represent TCP connections and HTTP connections in the order [in which] they occur[, with] parallel communications [duly] noted. Letters indicate the sequence of messages, including messages among different servers. In other words, (1a) and (1b) form the first TCP and HTTP connection, with

. . . 4. Once the MM software is installed and up-to-date, the [customer's] machine . . . invoke[s] the MM software, passing to it a set of relevant data including a URL for fetching the movie (see step 5), a token for fetching the license from a known server (see step 7), and other data for display within MM including title, movie length, pointers to cover art, and similar data.

5. (a) MM uses the passed URL to send an HTTP request to the CDR; this request includes a download token that can be checked against the authorization to download. CDR uses Movielink's Authentication Service (and in turn, Movielink Databases) to check the token via an HTTP HEAD method that simply returns an indication of validity or invalidity. If the token is valid, the CDR uses the IP address and Domain Name of the requesting site, as well as purchase information, to look up the appropriate CDS (using the Movielink Databases). If no special mapping is found, the CDR selects a default central CDS. (b) The CDS identifier is returned to the MM through the HTTP REDIRECT response, a response that provides an alternative URL for MM to use to obtain the information. More specifically, the REDIRECT incorporates the same URL with the name of the CDR replaced with that of the appropriate CDS. Steps 6 through 8 occur in parallel.

6. (a) MM takes the returned URL in the REDIRECT and issues a new HTTP GET request to the CDS; this request includes a download token that can be checked against the authorization to download. CDS uses Movielink's Authentication Service (and in turn Moviel-ink Databases) to check the token via an HTTP HEAD method that simply returns an indication of validity or invalidity. If the token is valid, (b) the CDS transmits the HTTP response, in this case including a digital movie file that is then stored by MM. Note that steps 5 and 6 could be completed using an ordinary web browser instead of MM, however an ordinary web browser would lack the facilities for managing the movies and, more important, for fetching and installing the license.

7. (a) MM sends a request to Website with the license token. If the token is valid, Website gets the license from the appropriate license server (which depends on the media player being used) and (b) returns it to MM.

8. During the process of steps 6 and 7, MM uses the HTTP POST method to send progress data back to Website. Such messages indicate when the download started, when the license was retrieved, etc. They are used to keep the storefront and customer service data up-to-date.

9. The user may commence playing any time after a sufficient portion of the video has been downloaded (in which case, the download continues as the playing commences). When the user plays the video (which occurs completely within the client computer), MM continues to POST progress data to the Website. If the computer is off-line, the progress data is held for later posting.

(D.I. 139, Ex. P at 8–9, Dr. Konstan's Rebuttal Expert Report, Oct. 6, 2004.)

Steps 6(a) and (b) are the focal points of the parties' arguments. Movielink argues

---

(1a) being the initiating message and (1b) being the response. Only after (1b) is concluded (and the TCP and HTTP connection is closed) does the TCP and HTTP connection formed from (2a) and (2b) commence." (D.I.

139, Ex. P at 7–8, Dr. Konstan's Rebuttal Expert Report, Oct. 6, 2004.) Steps 1 through 3 are omitted because they involve downloading the MM software and are not at issue in this case.

that its system does not have any component that could be considered a distribution interface and that regardless of this missing component, no part of its central system "initiates" connections. (D.I. 135 at 19; D.I. 158 at 7.) Instead, Movielink argues, in its system it is the user's home computer that "initiates" connections which result in the transmission of the requested movie. (D.I. 135 at 19; D.I. 158 at 7.) To support its argument, Movielink cites to the prosecution history of claim 1 of '792 patent and Dr. Konstan's Rebuttal Expert Report. (D.I. 135 at 19.)

Assuming that the Movielink system has a distribution interface, which is made up of the CDR, the CDS, or both,[11] the focus in this infringement analysis is on which components in the system can be said to "initiate" connections as stated in claim 1 of the '792 patent. As noted, the MM software uses HTTP over TCP/IP to communicate. (D.I. 139, Ex. P at 13, Dr. Konstan's Rebuttal Expert Report, Oct. 6, 2004.) Movielink's argument is essentially that "[i]n each case (specifically . . . [steps] 5 and 6 [as identified] above), the Movielink manager initiates the HTTP and TCP connection to the CDR (5a) or CDS (6a)," and then receives a reply as noted in steps 5(b) and 6(b). (*Id.*) Dr. Konstan's opinion is that "each contact between the user's computer (which is both the device that receives the video and the device used to make user requests) and the servers is initiated from the user's computer." (*Id.*) Dr. Konstan's opinion is based on his study of the Movielink system and the workings of the Internet, "where it is often the case that a server is incapable of initiating a TCP connection to the client[,]" in part because of the presence of a firewall. (*Id.* at 14.)

USVO asserts, however, that Movielink's argument regarding initiating the transmission of the video program is irrelevant because the claim language recites "initiates connections," not "initiates transmission." (D.I. 143 at 9.) I agree. My focus, therefore, is on USVO's response to Movielink's argument that the user in its system initiates the connections which result in the transmission of the video program. USVO cites the opinion of its expert, Dr. Beckman, that the CDR and CDS in the Movielink system "collectively are a distribution interface." (D.I. 139, Ex. L at 30, Dr. Beckman's Expert Report, Sept. 25, 2004.) USVO then argues that the Movielink distribution interface actually initiates two connections with the user's computer at a remote location. (D.I. 143 at 7–9.) USVO makes two specific arguments. First, USVO says that the redirect URL, described in steps 5(b) and 6(a) above, is an "initiating message" that causes the user's computer to form the resulting TCP connection. (*Id.* at 7.) Second, USVO argues that, in response to the user's computer opening a TCP connection to the CDS, the CDS opens an HTTP session, which is a connection initiated by the CDS and is part of Movielink's distribution interface. (*Id.* at 7–8.) Based on these arguments, USVO contends that a question of fact exists as to whether the functions of the CDS and the CDR read on the limitation "distribution interface initiates connections." (*See id.* at 7.)

Movielink's response to USVO's first argument, as noted in oral argument, is that USVO is improperly arguing to expand the claim term "initiates connections" to initiating "message." (Transcript, *Markman* Hearing, Nov. 30, 2004, at 63:19–21.) The point is correct. An initiating message is

11. Movielink vigorously asserts that it has no such interface (D.I. 135 at 19), but USVO contends that the CDR and CDS function as a distribution interface (D.I. 143 at 7.) For purposes of this analysis, I assume, without deciding, that USVO is correct.

not the same thing as initiating a connection. USVO's argument directly contradicts the express claim language requiring that the distribution interface initiate "connections" with the remote units. In fact, USVO's own expert, Dr. Beckman seems to recognize this when he states that "*Movielink Manager,* upon receipt of this HTTP Redirect, *automatically opens a TCP connection* with the CDS part of the distribution interface." (D.I. 139, Ex. L at 31, Dr. Beckman's Expert Report, Sept. 25, 2004 (emphasis added).) As shown in this quotation, it is MM, on the customer's computer, that initiates the TCP connection. Whether this occurs because the user pushes download, or because the HTTP Redirect instructs the user's computer to do it, is irrelevant. Either way, it is still the user's computer that actually "initiates" or begins the connections. USVO's argument is further weakened by the fact that the HTTP Redirect message is actually a *response* from the CDR to the request initiated by MM on the user's computer. Dr. Beckman agrees that the HTTP Redirect is a response when he notes, "[t]his message is sent in direct response to the user clicking the 'Start Download Now' button...." (*Id.*) Therefore, I agree with Movielink that it is the user's computer and not the CDR that "initiates" this TCP connection with the CDS.

USVO's second argument simply lacks a foundation. USVO argues that Dr. Konstan, Movielink's expert, agreed that "a session is a connection." (D.I. 143 at 7.) Specifically, USVO cited to the following deposition testimony:

> A ... And there is nothing in the Movielink system that gives the CDS the permission to decide when it would be convenient to send a movie back.

Q So you do believe that is a requirement of the patent?

A Yes.

(D.I. 143, Ex. 3 at 121:9–14, Dep. Dr. Joseph Konstan, Oct. 13, 2004.) This deposition testimony does not support USVO's argument that a "session is a connection." [12] (D.I. 143 at 7–8.) Furthermore, there is no evidence that the CDS "initiates" the HTTP session. As described in step 6(a) above, after MM receives the HTTP Redirect, it sends an HTTP GET to the CDS. Then, as described in step 6(b), the CDS responds to the HTTP GET by "creat[ing] the data structures needed within its own code to participate in the session." (D.I. 139, Ex. P at 15, Dr. Konstan's Rebuttal Expert Report, Oct. 6, 2004.) Calling this "opening" the session, does not mean that the CDS "initiates" the session, or the connection. An appropriate analogy is to the use of the telephone. When A calls B and B picks up the phone and says "hello," B can be considered to have "opened the call," but it is still A who "initiated" the connection. Thus, the TCP and HTTP connections are both initiated by the MM software that resides on the user's computer, and not by Movielink's distribution interface, assuming it has one.

Based on the foregoing, there is no issue of fact to prevent the conclusion that the Movielink Multi–CDN system does not have a distribution interface that "initiates connections," as "initiates" has been construed in claim 1. Therefore, because I find that Movielink does not practice all of the limitations of claim 1 of the '792 patent, it cannot literally infringe.

### 2. Doctrine of Equivalents

 Movielink argues that USVO is not entitled to any scope of equivalents

---

**12.** It is not readily apparent that Dr. Konstan was testifying about the HTTP session be- cause USVO submitted only a single page of his deposition testimony.

with respect to the limitation "distribution interface initiates connections." (D.I. 135 at 20.) Specifically, Movielink points to the prosecution history of claim 1 of the '792 patent, stating that "these limitations were added to the claimed subject matter in response to a prior art rejection." (*Id.*) Movielink argues that, based on the prosecution history, it is clear that USVO added the "distribution interface initiates connections" limitation to claim 1 of the '792 patent in order to avoid prior art, which is a well-settled basis for invoking prosecution history estoppel to infringement under the doctrine of equivalents. (*See id.*)

USVO's original United States application for the '792 patent was filed on February 1, 1990. Original Claim 1 was drafted as follows:

1. A system for displaying stored video programs at a remote location, comprising:

a central storage facility for storing programs in digitized, compressed form;

a communications link for transmitting stored programs to the remote location;

a receiver at the remote location for decompressing the transmitted program and converting it to a signal suitable for display; and

a display connected to said receiver for displaying the transmitted program.

(D.I. 139, Ex. F, Original Specification at 18.) At that time, original claim 1 did not contain any reference to the "distribution interface initiates connections" limitation. (*Id.*) In response to the Examiner's Office Action rejecting all of the original claims, and specifically claim 1 as anticipated by Cohen, a prior art patent reference, the applicants substituted an entirely new claim, and, for the first time, incorporated the "distribution interface initiates connections" limitation. (*Id.*, Ex. H at 2, Amendment.) As discussed above, *supra* Part

IV.A.2, the applicants argued that "[t]he Cohen reference describes a system in which a local unit calls a central unit over telephone lines, and initiates a download of a video program such as a movie.... The telephonic connection and request is made by the local unit itself...." (*Id.*, Ex. H at 7, Amendment.) The applicants then relied on the "distribution interface initiates connections" limitation to distinguish the claimed invention from Cohen and the other references. *See supra* Part IV.A.2.

There is no question that the applicants' amendments during prosecution were made to narrow the literal scope of the claim, and that the reason for the amendment "was a substantial one relating to patentability." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1366 (Fed.Cir.2003) (citing *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed.Cir.2003)). It is clear from the prosecution history that amending the claim to include the "distribution interface initiates connections" limitation was an important factor in the applicants' efforts to overcome the Examiner's prior art rejection. Thus, USVO must overcome the presumption that it "has surrendered all territory between the original claim limitation and the amended claim limitation." *Id.* at 1367 (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 740, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002) ("*Festo VIII*")).

USVO may rebut that presumption if it can demonstrate "that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment, that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question, or that there was 'some other reason' suggesting that the patentee could not reasonably have been expected to have described

the alleged equivalent." *Id.* at 1368 (citing *Festo VIII*, 535 U.S. at 740–41, 122 S.Ct. 1831). USVO does not respond to Movielink's argument regarding the import of *Festo VIII* in its Opposition to Movielink's Motion for Summary Judgment on Non–Infringement and Invalidity (D.I.143). The only response offered by USVO was made in its Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment of Non–Infringement (D.I.142). USVO did not attempt to rebut the presumption but instead argued that the issue of infringement under the doctrine of equivalents is "moot or not ripe for determination" because "[t]he parties have not yet joined issue on [these] questions . . . ." (D.I. 142 at 21.) USVO's argument is essentially that "questions of infringement under the doctrine of equivalents cannot be finally answered until *after* the Court's claim construction." (*Id.* at 23 (emphasis in original).) In support, USVO cites *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1478–79 (Fed.Cir.1998), *cert. denied*, 525 U.S. 877, 119 S.Ct. 181, 142 L.Ed.2d 148 (1998), for the proposition that a "patentee must be permitted to try infringement theories becoming relevant only after final claim construction." (D.I. 142 at 22.)

USVO's reliance on *Exxon Chemical Patents* is misplaced and does not rebut the presumption detailed above. In that case, the Federal Circuit held that it was improper for the district court not to entertain a motion for new trial on the issue of infringement under the doctrine of equivalents when "[t]he question whether there could be doctrine-of-equivalents infringement under the claim construction adopted by [the Federal Circuit] became a critical issue in the case only after this court's decision on appeal." *Exxon Chemical Patents*, 137 F.3d at 1479. That is not the same situation presented here. The issue of infringement under the doctrine of

equivalents was pled by USVO in its Complaint and was appropriately briefed and argued by Movielink in its two motions for summary judgment (D.I.132, 134). Therefore, USVO's citation to *Exxon Chemical Patents* is inapposite.

I find that, based on the prosecution history and lack of evidence presented by USVO on the issue of infringement under the doctrine of equivalents, USVO has not rebutted the presumption that it "has surrendered all territory between the original claim limitation and the amended claim limitation." *Festo Corp.*, 344 F.3d at 1367 (citing *Festo VIII*, 535 U.S. at 740, 122 S.Ct. 1831). Therefore, USVO is estopped from asserting that Movielink's Multi–CDN system infringes claim 1 of the '792 patent under the doctrine of equivalents.

### 3. Indirect Literal Infringement: Inducement and Contributory Infringement

Movielink has moved for summary judgment that it does not indirectly infringe claim 1 of the '792 patent. (D.I. 133 at 1.) Whether directly infringing or not, "a party may still be liable for inducement or contributory infringement of a method claim under 35 U.S.C. §§ 271(b), (c) if it sells infringing devices to customers who use them in a way that directly infringes the method claim." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed.Cir.2004) (citing *RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1267 (Fed.Cir.2003)). In its Complaint, USVO alleged that Movielink's activities infringe the '792 patent by inducing infringement and contributing to infringement. (D.I. 1 at ¶ 20.)

Movielink argues that it is entitled to summary judgment on the issue of indirect infringement because USVO "never advanced any evidence or explanation to support inducement and/or contributory in-

fringement." (D.I. 159 at 8–9.) While USVO has presented some evidence of indirect infringement, its explanation for the lack of a more fully articulated position is explained in its Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment of Non–Infringement (D.I.142). USVO explains that "[b]ecause Movielink has not denied such responsibility [for forming the combination of all the allegedly infringing elements], questions of inducement and contributory infringement are not in issue." (D.I. 142 at 23.) USVO continues, "[h]owever, if Movielink were to change its position and argue that it is not responsible for some or all of the accused components, USVO should be permitted to respond that Movielink is nevertheless 'liable as an infringer,' as permitted by the Patent Act, for induced or contributory infringement...." (*Id.*)

 Accordingly, because Movielink has not changed its position, USVO essentially has admitted that indirect infringement is not at issue. (*Id.*) Even if USVO had not admitted that indirect infringement is not at issue, it is well settled that, absent direct infringement, there can be no inducing or contributory infringement. *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687 (Fed.Cir.1986). As discussed above, I have found that Movielink's activities do not infringe because its Multi–CDN system does not practice the "distribution interface initiates connections" limitation of claim 1. Because the distribution interface in Movielink's system, if Movielink's system has one at all, resides at its Secaucus facility, no one using the Movielink system could be in the position to practice this limitation besides Movielink itself. Thus, there is no possibility that someone other than Movielink could directly infringe claim 1, and as such, Movielink cannot be liable for indirect infringement.

## V. CONCLUSION

Accordingly, USVO's Motion for Summary Judgment as to the Gunter Article and the '792 Patent's Enablement of the Internet (D.I.127) will be denied as moot, USVO's Motion to Exclude or Limit Admissibility of the Expert Reports and Testimony of Richard T. Mihran and Joseph A. Konstan (D.I.129) will be denied as moot. Movielink's Motion for Summary Judgment of Non–Infringement Relating to USVO's Infringement Allegations for Which No Support in the Record Exists (D.I.132) will be granted in so far as it pertains to indirect infringement. Movielink's Motion for Summary Judgment of Non–Infringement, and its Alterative Motion for Summary Judgment of Invalidity (D.I.134) will be granted as to non-infringement, and Movielink's Motion for Summary Judgment of Invalidity under 25 U.S.C. § 112 and to Strike Portions of Expert Report (D.I.136) will be denied as moot.

### ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED that USVO's Motion for Summary Judgment as to the Gunter Article and the '792 Patent's Enablement of the Internet (D.I.127) is DENIED as moot, USVO's Motion to Exclude or Limit Admissibility of the Expert Reports and Testimony of Richard T. Mihran and Joseph A. Konstan (D.I.129) is DENIED as moot. Movielink's Motion for Summary Judgment of Non–Infringement Relating to USVO's Infringement Allegations for Which No Support in the Record Exists (D.I.132) is GRANTED in so far as it pertains to indirect infringement. Movielink's Motion for Summary Judgment of Non–Infringement, and its Alterative Motion for Summary Judgment of Invalidity (D.I.134) is GRANTED as to non-infringement, and Movielink's Motion for Summary Judgment of Invalidity under 25

U.S.C. § 112 and to Strike Portions of Expert Report (D.I.136) is DENIED as moot.